# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

MARITES LUSTADO LYBARGER,⁣ )
                                   )
                 Plaintiff,    )
      v.                                )        No. 20-00601-CV-W-BP
                                     )
DENIS McDONOUGH, Secretary,   )
United States Department of Veterans Affairs,[1] )
                                     )
and                                        )
                                     )
UNITED STATES OF AMERICA,    )
                                     )
                 Defendants.  )

## ORDER AND OPINION GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff formerly worked for the Veterans Canteen Service, ("VCS"), a component or entity within the Department of Veterans Affairs (the "VA") that provides food, beverage, and vending services to VA Hospitals.  She alleges that she while she was employed at the VCS she was subjected to discrimination based on her race, gender, and disability, forced to work in a hostile working environment, and was subjected to retaliation for engaging in protected activity. Defendants[2] seeks summary judgment on all claims, and Plaintiff opposes their request.  As discussed more fully below, Defendants' motion, (Doc. 26), is **GRANTED**.

## I.  BACKGROUND

At the outset, the Court notes that Plaintiff has asserted many facts that are not supported by the parts of the Record she cites.  For the most part, facts that are not supported by the portions

---

[1] Denis McDonough was confirmed as the Secretary of the Department of Veterans Affairs on February 8, 2021, and is automatically substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] It is not clear whether the United States is a proper/independent party to this suit, but it is still a named defendant and in the interest of clarity the Court will refer to "Defendants."

of the Record cited will not be mentioned in this Order. Plaintiff has also controverted several facts by disputing an insignificant detail; the Court will not cite to the Record for all such facts.[3]

## A. Plaintiff's Employment With VCS

Plaintiff is female, a native of the Philippines, and she suffers from diabetes. Plaintiff was hired by VCS on April 16, 2017, as a Food Service Worker; her immediate supervisor was Gary George (the Assistant Canteen Chief) and his supervisor was Lindsay Hagan (the Canteen Chief).[4] Upon being hired she began a one-year period of probationary employment. These facts are supported by extensive testimonial and documentary evidence. (*E.g.*, Doc. 26-2, p. 3 (Hagan Dep., pp. 15-16); Doc. 26-3.)[5] Plaintiff attempts to controvert these facts, contending that she was hired in December 2016, so her probationary period ended in December 2017. (*E.g.*, Doc. 30, p. 4.) However, the portions of the Record she cites do not establish that she was hired in December 2016; in fact, the portions of the Record she cites do not address this issue at all. (*See* Doc. 30-2, p. 23 (Plaintiff Dep., p. 89); Doc. 30-4.)[6]

Plaintiff also contends that she was hired as, or promoted to, Vending Supply Clerk. (*E.g.*, Doc. 30, pp. 4-5.) However, the portions of the Record that she cites do not establish this fact. The Record establishes that a Vending Supply Clerk performs duties related exclusively to vending

---

[3] In her own proposed uncontroverted facts, Plaintiff has included multiple facts within each numbered paragraph instead of listing each fact in a separate paragraph as required by Local Rule 56.1. This has further complicated the analysis because frequently the cited material supports some, but not all, of the facts asserted in a single paragraph.

[4] Hagan's last name is sometimes spelled "Hagen." The Court believes that "Hagan" is correct.

[5] Unless otherwise indicated all page numbers are those generated by the Court's CM/ECF system and may not correspond to the document's original pagination.

[6] Plaintiff also suggests that probationary employees are subject to the Collective Bargaining Agreement, (Doc. 30, p. 4), but the materials she cites do not establish this fact. The first item she cites, (Doc. 30-3, pp. 1-4), appears to be a portion of the Collective Bargaining Agreement but it says nothing about probationary employees. The second item, (Doc. 30-3, pp. 5-7), is an article about an arbitrator's decision; even if the article could be considered under Rule 56, it does not say anything about probationary employees. Finally, the third item cited, (Doc. 30-4), is a statement from a union representative that says nothing about the rights of probationary employees under the Collective Bargaining Agreement.

2

machines: inspecting, restocking, collecting coins, and so forth. (*E.g.*, Doc. 30-5.) In contrast, a Food Service Worker performs a variety of functions related to food service, which could include some duties related to vending machines. (*E.g.*, Doc. 26-5.) While Plaintiff performed some duties related to vending machines, she did not do so on a full-time basis and she performed the variety of duties associated with being a Food Service Worker; thus, she was not a Vending Supply Clerk. (Doc. 26-2, pp. 3-4 (Hagan Dep., pp. 16-17); Doc. 26-6, pp. 6, 8; Doc. 26-11; *see also* Doc. 30-2, p. 7 (Plaintiff Dep., pp. 26-27 (Plaintiff's testimony confirming that her job duties varied and included more than attending to vending machines)).)[7]

When Plaintiff was hired, she was paid $10.00 per hour and her hourly pay eventually increased to $10.69 per hour. Plaintiff believes that her two immediate predecessors – Michael Sims and Toni Comacho – were being paid more than she was.[8] Sims was hired as a Supply Clerk (not a Food Service Worker) in 2014. Thus, he was hired for a different job and had been working longer than Plaintiff. Camacho was originally hired as a Food Service Worker but unlike Plaintiff she was later given the position of Vending Supply Clerk, and also had been working longer than Plaintiff. Plaintiff, Sims and Camacho were paid the rates indicated by VCS's pay schedules.

VCS's policies required that money collected from vending machines be secured. On September 22, 2017, Hagan issued Plaintiff a letter of counseling, advising that on September 6 Plaintiff had violated this policy by "leaving vending money . . . unsecured in a government vehicle" earlier that month. (Doc. 26-14.) And, there is no dispute that Plaintiff left money collected from vending machines in a locked van. Plaintiff disputes that doing so meant that the

---

[7] As Hagan explained, "Kansas City's vending operation is a part-time vending operation so you are actually assigned to another job position and the vending is basically an additional" duty, performed three days a week. (Doc. 26-2, p. 4 (Hagan Dep., pp. 17-18); *see also* Doc. 26-6, p. 8.)

[8] On occasion Camacho's first name is represented to be "Tony," but the Court believes that "Toni" is correct. In addition, Sims's last name is sometimes spelled "Simms;" the Court believes that "Sims" is correct.

money was "unsecured" because it was inside a dark container in the back of the van, the van was locked, and the van was parked in a place where there was camera surveillance. (Doc. 30-2, p. 22 (Plaintiff Dep., pp. 86-87).) She also contends that while Sims was training her he told her that it was acceptable to leave the money locked in her vehicle, and that she saw him do it. (Doc. 30-2, pp. 22-23 (Plaintiff Dep., pp. 88-89).)[9]

As indicated, Plaintiff's duties as a Food Service Worker varied: at times she performed tasks related to vending machines, at other times she worked in the kitchen, and at still other times she worked as a cashier. When she was performing tasks related to vending machines, she could take her breaks and lunches whenever she wanted. However, when she was working in the kitchen or as a cashier, her breaks had to be approved by George or Hagan to coordinate them with other workers and the need for proper coverage during lunch. Due to lunch hour responsibilities, employees could not take breaks between 11:00 and 1:00.[10]

Plaintiff contends that the VA knew she had diabetes, and this fact is supported by the Record. In November 2017, a Human Resources Specialist contacted Plaintiff to determine if she needed any accommodations for her diabetes. Plaintiff responded by stating: "I have no medical condition that prevent[s] me from performing my assign[ed] duties" and expressing displeasure that the inquiry was made. (Doc. 26-15.) Hagan also told Plaintiff that if she had to take breaks

---

[9] Plaintiff also testified that Hagan knew that Sims left money in a vehicle and did not counsel him, but she has no basis for this knowledge (particularly with respect to what Hagan knew) so her testimony is not competent evidence on this point. (*See* Doc. 30-2, pp. 22-23 (Plaintiff Dep., pp. 88-89).) And with no evidence that Hagan knew that Sims left money in a vehicle yet failed to counsel him, Plaintiff cannot rely on Sims as a comparator to demonstrate that she was treated differently than Sims. *E.g., Elam v. Regions Fin. Corp.*, 601 F.3d 873, 881 (8th Cir. 2010).

[10] Plaintiff agrees that this was the policy. (Doc. 30-2, p. 8 (Plaintiff Dep., p. 29).) She nonetheless contends that "white employees were allowed breaks during those times," (Doc. 30, p. 14), but the testimony she cites only confirms that on the day in question certain employees (who happened to be white) were due for a break and does not establish that they were allowed to take a break between 11:00 and 1:00 or that their race had anything to do with the matter. (*See* Doc. 30-2, p. 8 (Plaintiff Dep., pp. 30-31).) Other materials that she cites similarly fail to state that employees were allowed to have breaks or lunch between 11:00 and 1:00. (*E.g.*, Doc. 30-28 (which is not a sworn statement in any event); Doc. 30-2, p. 8 (Plaintiff Dep., p. 30).)

4

at a certain time then Plaintiff would have to provide a doctor's note, (Doc. 26-2, p. 11 (Hagan Dep., p. 46), but Plaintiff never did so.[11]

At approximately 10:45 a.m. on December 12, 2017, Plaintiff was directed to run a cash register. She advised George that she had not taken a morning break and requested a thirty-minute lunch break. George told her that she could not have a thirty-minute break because that would take her break past 11:00, but she could have a fifteen-minute break. Plaintiff took that break and got something to eat before starting her 11:00 shift on the cash register. However, during her shift her blood sugar became low. A customer asked if she was alright and Plaintiff "said that she was okay but her blood sugar was a little low. She was shaking, distraught, and struggling at the cash register. Tears were streaming down her face." (Doc. 30-17, ¶ 5.) During this episode Plaintiff again asked George if she could have her lunch break, but George communicated that she could have her lunch break at 1:30 because another employee was due for her lunch break first. (Doc. 30-17, ¶ 7; Doc. 30-2, p. 8 (Plaintiff Dep., pp. 30-31); Doc. 26-2, p. 12 (Hagan Dep., p. 58).) At some point during this incident, Plaintiff yelled (apparently to or at co-workers) about not getting a lunch break. (Doc. 26-2, pp. 11-12 (Hagan Dep., pp. 57-59).)[12]

On December 18, 2017 – before Plaintiff's probationary period ended – Hagan terminated Plaintiff's employment. The written notice recites that Plaintiff was in the midst of a one-year

---

[11] Plaintiff refers to a note from Dr. Marijen Aga, (Doc. 30 p. 25), but (1) there is no evidence that the note was provided to Hagan, George, or anyone else and (2) the note does not indicate that Plaintiff needs to have her breaks at any particular time. (Doc. 30-24.)

[12] Plaintiff has provided other statements about this incident from other individuals and frequently refers to their contents. The Court does not rely on them because they are not signed or are not statements made under oath or under penalty of perjury, *see* 28 U.S.C. § 1746, and thus cannot be considered under Rule 56. (*See, e.g.*, Doc. 30-18, 30-19, 30-20, and 30-21.) Plaintiff also contends that she did not yell but the materials she cites do not support that proposition, and in her deposition she testified that "[a]ll I can remember is I was sick and vomiting. I don't remember that I [had] any outbursts in front of customers." (Doc. 30-2, p. 31 (Plaintiff Dep., p. 123).) Plaintiff attempts to provide different testimony with her affidavit supplied after discovery closed, (Doc. 32-1, ¶ 9), but an affidavit cannot be used to contradict the affiant's prior deposition testimony and thereby create a factual dispute without some explanation for the change. *E.g., City of St. Joseph, MO v. Southwestern Bell Tel.*, 439 F.3d 468, 475-76 (8th Cir. 2006).

5

probatory period, and the termination was based on Plaintiff's failure to secure money in September and her outburst in December. (Doc. 26-8.)

There are several additional incidents that are supported in the Record (although some, such as changes to Plaintiff's schedule, are disputed by Defendants), but the Record does not reflect when they occurred, so they are listed below. Unless otherwise indicated, the Record does not support any of these events occurring more than once:[13]

- Plaintiff requested help from George, and he made fun of her and said she was slow.

- Plaintiff was crying and George yelled at her.

- George slammed the door to his office on Plaintiff.

- George pointed a finger in Plaintiff's face and accused her of spreading rumors.

- On several occasions George (and perhaps Hagan) delayed giving Plaintiff keys that she needed to perform her job.

- George instructed that deliveries be unloaded in a place Plaintiff believed that they should not be unloaded.

- Hagan changed Plaintiff's schedule from flexible to fixed/regular.

- In September, Plaintiff was told that her deposit was $300 short, but the money was eventually found in the safe. Plaintiff believes this was a setup to get her in trouble. She asked Hagan to investigate but no investigation was conducted.

- Hagan threatened to charge Plaintiff with being AWOL but did not do so.

---

[13] There are other incidents identified by Plaintiff in her briefing, but they are not listed because the Record does not support their occurrence. In addition, the Court has not included Plaintiff's testimony that Ana Marie Martin told her that Hagan told her (Martin) to start rumors about Plaintiff because Plaintiff's testimony about Martin's statements is hearsay, (Doc. 30-2, p. 30 (Plaintiff Dep., p. 118)), and there is no sworn statement from Martin.

6

## B. Procedural History

The Court previously discussed the administrative process and Plaintiff's claims when it addressed Defendants' Motion to Dismiss.  The Court held that Plaintiff exhausted five discrete acts of discrimination, all of which she categorized as discrimination based on gender, race/national origin, or disability, or retaliation for engaging in protected activity.  Those five discrete acts are:

- Between August and December in 2017, Hagan and George failed to provide Plaintiff with "two 15 minute breaks and her 30 minute lunch break, in order to eat and prevent a diabetic coma and/or diabetic symptoms from occurring."
- Plaintiff was paid a lower hourly rate than her two predecessors.
- On September 1, 2017, Hagan changed Plaintiff's schedule from a schedule with flexible duty hours to a fixed schedule.
- On September 22, 2017, Hagan issued Plaintiff a written letter of counseling for leaving vending machine money unsecured.
- On December 8, 2017, Hagan issued Plaintiff a letter terminating Plaintiff.

(Doc. 20, p. 3.)  Plaintiff later exhausted a claim that Hagan's threat to write-up Plaintiff for being AWOL constituted retaliation for starting the administrative process.  (Doc. 20, p. 4.)  Plaintiff also exhausted a claim of hostile work environment based on gender, race/national origin, or disability that was based on these six discrete events and the other incidents discussed in Part I.A, above.  (Doc. 20, pp. 3-4 (discussing Doc. 7-1, pp. 2-3 & n.3).)  Finally, the Court held that Plaintiff's claim of failure to accommodate her disability could proceed.  (Doc. 20, pp. 9-10.)

Plaintiff's Complaint, (Doc. 1), contains six counts, some of which assert more than a single claim or theory.  Those six counts are:

| Count I | Discrimination based on race or gender, |
|---|---|
| Count II | Discrimination based on disability or perceived disability, |
| Count III | Hostile Work Environment based on race, color, or national origin, |
| Count IV | Hostile Work Environment based on gender, |
| Count V | Retaliation, and |
| Count VI | Failure to Accommodate |

As discussed in the Court's Order that granted in part Defendants' Motion to Dismiss, (Doc. 20), the Court held that some of the discrete claims of discrimination asserted in the Complaint had not been exhausted. Those claims were dismissed, and the ensuing discussion in this Order will only address the aspects of Counts I -VI that were not dismissed in the Court's prior Order.

Defendants seeks summary judgment on all six counts, contending that the undisputed facts in the Record demonstrate that there is no triable issue for a jury to resolve. Plaintiff argues that there are disputed issues of material fact that preclude judgment as a matter of law on any of her claims. The Court resolves the parties' arguments below.

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only upon a showing that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation

omitted).  In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985).  A party opposing a motion for summary judgment may not simply deny the allegations, but must point to evidence in the Record demonstrating the existence of a factual dispute.  FED. R. CIV. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909-10 (8th Cir. 2010).

A motion for summary judgment "may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment" is satisfied.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  The moving party can make this showing by demonstrating the respondent's inability to prove facts necessary to support his claim.  *Id.* at 322-23.  "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325; *see also St. Jude Med., Inc. v. Lifecare Int'l, Inc.,* 250 F.3d 587, 596 (8th Cir. 2001).  The moving party still "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the Record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.,* 477 U.S. at 323.  But "[i]t is enough for the movant to bring up the fact that the record does not contain [evidence to support the] issue and to identify that part of the record which bears out this assertion.  Once this is done, [the moving party's] burden is discharged, and, if the record in facts bears out the claim that no genuine dispute exists  . . . it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue."  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273-74 (8th Cir. 1988); *see also*

9

*Estate of Barnwell v. Watson*, 880 F.3d 998, 1004 (8th Cir. 2018). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case . . . necessarily renders all other facts immaterial.'" *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.,* 732 F.3d 882, 886 (8th Cir. 2013) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)); *see also Blake v. JM Optical, Inc.,* 870 F.3d 820, 825 (8th Cir. 2017).

## A. Count I – Discrimination Based on Race or Gender

In Count I, Plaintiff alleges that she was subjected to disparate treatment based on her race or gender in violation of Title VII of the Civil Rights Act. The parties agree that analysis of Plaintiff's claim is governed by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff must first establish a prima facie case of discrimination, *e.g., Heisler v. Nationwide Mut. Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019), which requires Plaintiff to present evidence that (1) she is a member of protected class, (2) she met Defendants' legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *E.g., Faulkner v. Douglas County, NE*, 906 F.3d 728, 732 (8th Cir. 2018). If Plaintiff presents a prima facie case, the burden shifts to Defendants to present a legitimate, nondiscriminatory reason for the adverse employment action. *E.g., Heisler*, 931 F.3d at 794. Then, if Defendants present a legitimate, nondiscriminatory reason for its actions, the burden shifts back to Plaintiff to identify evidence demonstrating that the Defendants' proffered reason is a pretext for discrimination. *Id*.

Defendants contend that undisputed facts in the Record establish that there was no inference of discrimination. And, relying on the same reasoning, they contend that they have provided legitimate, nondiscriminatory reasons for those decisions, and there are no facts demonstrating pretext. The Court agrees with Defendants.

### 1. The Failure to Allow Plaintiff to Take Breaks

In her Suggestions in Opposition, Plaintiff has distilled this aspect of Count I to Defendants' failure to let her take a break between 11:00 and 1:00 on December 12, 2017. (Doc. 30, p. 55.) However, the Record establishes that Defendants do not allow any employees to take breaks between 11:00 and 1:00 because of the need to attend to the lunch crowd. This policy does not create an inference of discrimination (which means that Plaintiff cannot present a prima facie case) and it also serves as a legitimate, non-discriminatory reason for the denial of Plaintiff's request on December 12, 2017. Plaintiff opposes this conclusion by contending that "Kathy Karr, a Caucasian cashier, was given two breaks during that time" on December 12, 2017, and supervisors had a pattern or practice of refusing Plaintiff breaks. (Doc. 30, p. 55.) However, the Record does not support Plaintiff's contentions. There is no evidence in the Record that Karr (or anyone) was given a break between 11:00 and 1:00 on December 12, 2017.[14] Even if Plaintiff's claim is broader, in that she is contending that she was denied breaks on occasions other than December 12, 2017, the Record does not establish that anyone was allowed to have breaks between 11:00 and 1:00 on other days – and Plaintiff does not identify anyone who was.

### 2. Plaintiff's Pay

Plaintiff's claim of disparate pay relies on the fact that she was paid less than Michael Sims and Toni Camacho. In making this argument Plaintiff compares her starting pay to the pay Sims and Camacho were receiving when she started. This is an inapt comparison for two reasons. First, the fact that Sims and Camacho had been working for VCS for some time before Plaintiff started does not suggest that their different pay was the product of discrimination. Certainly, their seniority constitutes a legitimate, nondiscriminatory reason for the difference. *E.g., Dodd v.*

---

[14] Karr is female, so Plaintiff could not rely on anything Defendants did with respect to Karr's breaks to establish her gender discrimination claim.

*Runyon*, 114 F.3d 726, 730 (8th Cir. 1997).  Second, Sims and Camacho did not have the same job as Plaintiff, and all three were paid the amounts designated in VCS's pay schedules.  Plaintiff reiterates her theory that she was a Vending Supply Clerk and not a Food Service Worker; the Court will not repeat its prior discussion in Part I.A explaining why Plaintiff's depiction of the facts is not supported by the Record.  It is sufficient to reiterate that Plaintiff was a Food Service Worker; some of her duties involved servicing and supplying vending machines, but she was not given the position of Vending Supply Clerk.  Therefore, VCS's decision not to pay her as a Vending Supply Clerk, or the same amount as employees who had been working longer, was not discriminatory.

### 3.  Changes to Plaintiff's Schedule

Plaintiff presents no argument explaining how the change from a flexible schedule to a fixed schedule constituted disparate treatment based on gender or race, and there is nothing apparent from the (sparse) facts on this matter that would suggest that it could.    Therefore, Defendants are entitled to summary judgment on this aspect of Count I.

### 4.  Counseling for Leaving Money Unsecured

Plaintiff claims that the discipline she received for leaving vending machine money in a locked car constituted disparate treatment based on her gender or race.    However, the circumstances do not give rise to an inference of discrimination.  Plaintiff has testified that when he was training her, Sims left money in a locked car – but there is no competent evidence that Hagan (or anyone else) knew that Sims did so.  Therefore, the fact that Sims was not disciplined does not create an inference that Plaintiff's discipline was based on her gender or race.

Plaintiff also points to the perceived unfairness of the discipline, contending that she was not properly trained by Sims and was not aware that the policy forbade leaving vending machine

money in a locked car. However, it is well-established that "[t]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 977 (8th Cir. 2012) (quotation omitted). Even if there is evidence that Hagan's decision to discipline Plaintiff was harsh, that fact alone would not establish that the action was discriminatory. *E.g., Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 939 (8th Cir. 2019); *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 812 (8th Cir. 2005). In the absence of any evidence suggesting that Hagan disciplined Plaintiff because of Plaintiff's race or gender, this aspect of Count I cannot proceed.

### *5. Plaintiff's Termination*

Finally, Count I alleges that Plaintiff's termination was based on her gender or race. However, Plaintiff identifies no evidence that could be admitted at trial that would cause a factfinder to believe that her gender or race played any role in the decision. (Doc. 30, pp. 57-60.) She mentions her requests for training that went unanswered, but this does not create an inference of discrimination (much less discrimination based on gender or race).[15] At best, Plaintiff has presented evidence that her termination was not fair – but as discussed in Part II.A.4, unfairness alone does not create an inference of discrimination.

### B. Count II – Discrimination Based on Disability or Perceived Disability

Plaintiff's claims related to her disability arise under the Rehabilitation Act which, in the employment context, incorporates the Americans with Disabilities Act ("the ADA"), 42 U.S.C. §§

---

[15] Plaintiff's discrete claim that she was denied training based on her gender or race was dismissed during the administrative process as time-barred. (*See* Doc. 20, p. 3.)

12111 *et seq.*, 12201-04, 12210. 29 U.S.C. § 794(d). Therefore, in the employment context cases construing the ADA may be relied on when discussing the Rehabilitation Act, *e.g., Wojewski v. Rapid City Regional Hosp., Inc.,* 450 F.3d 338, 344 (8th Cir. 2006), and the Court may rely on ADA cases without identifying them as such.

The *McDonnell Douglas* burden-shifting analysis applies to Plaintiff's claims under Count II. This requires a plaintiff to first establish the elements of a prima facie case: (1) she has a qualifying disability; (2) she has the qualifications to perform the essential functions of her position with or without reasonable accommodation; and (3) she experienced an adverse employment action due to her disability. *Norman v. Union Pac. R.R. Co.,* 606 F.3d 455, 459 (8th Cir. 2010); *Mershon v. St. Louis Univ.,* 442 F.3d 1069, 1076 n.4 (8th Cir. 2006). If the Plaintiff establishes a prima facie case, the burden shifts to Defendants to identify a legitimate, nondiscriminatory reason for the adverse action; at that point, the burden shifts back to Plaintiff to identify evidence that would suggest the Defendants' proffered reason is a pretext for discrimination. In contrast to the ADA, under the Rehabilitation Act "the person's disability must serve as the sole impetus for a defendant's adverse action against the plaintiff." *Dick v. Dickinson State Univ.,* 826 F.3d 1054, 1060 (8th Cir. 2016).

Defendant is entitled to summary judgment for two independent reasons. First, there is no evidence in the Record that would establish Plaintiff suffered from a disability. Second, Plaintiff cannot demonstrate a connection between Defendants' actions and her alleged disability, or that Defendants' actions were a pretext for discrimination.

### *1. Whether Plaintiff's Diabetes is a Disability*

The Rehabilitation Act incorporates the ADA's definition of disability, 29 U.S.C. § 705(20)(B), and the ADA defines a disability as "(A) a physical or mental impairment that

14

substantially limits one of more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(2)(A)–(C); *see also Canny v. Dr. Pepper/Seven–Up Bottling Group, Inc.*, 439 F.3d 894, 900 (8th Cir. 2006). Major life activities include but are not limited to "caring for oneself, performing manual tasks, walking, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

The Record establishes that Plaintiff is a diabetic, and diabetes *can* be a disability. However, Plaintiff has not established that *her* diabetes qualified as a disability. "It is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires [a plaintiff] to prove disability by offering evidence" regarding the extent of the limitation. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002). The determination must be made in case-by-case manner, *e.g., Ristrom v. Asbestos Workers Local 34 Joint Apprentice Comm.*, 370 F.3d 763, 769 (8th Cir. 2004), so the mere fact that Plaintiff has diabetes does not mean that she is disabled within the meaning of the Rehabilitation Act. To be disabled, the limitation must be substantial and, when the life activity that is allegedly limited is the ability to work, the plaintiff must demonstrate that there is a broad class of jobs she cannot perform. *E.g., Samuels v. Kansas City Missouri Sch. Dist.*, 437 F.3d 797, 801-02 (8th Cir. 2006).

While Plaintiff has established that she has diabetes, the Record does not contain evidence of any requirements or limitations. She avers in a broad manner that "[a]t all times, I told my supervisors of my condition and need to take regular breaks," (Doc. 32-1, ¶ 7), but other than this general statement her need to take regular breaks is not established in the Record. She refers to

the note from Dr. Aga, (Doc. 30-24), but as discussed earlier the note does not say anything about Plaintiff needing breaks. Her other allegations about needing to take regular breaks are not supported with citations to the Record. (*See, e.g.*, Doc. 30, p. 43 (Plaintiff's proposed uncontroverted facts 70-71.).) In short, the Record does not establish that Plaintiff is disabled within the meaning of the Rehabilitation Act.

## 2. Connection Between Plaintiff's Diabetes and the Adverse Employment Actions, and Pretext

Even if Plaintiff is disabled, for the reasons discussed in Part II.A the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claim that her disability had any role in the awarding of breaks, Plaintiff's pay, Plaintiff's schedule, or the discipline for leaving money in a locked car. There is simply no evidence that would (1) create an inference that Plaintiff's disability had a role in these decisions or (2) demonstrate that Defendants' legitimate, nondiscriminatory reasons are a pretext for discrimination.

Plaintiff's claim that she was terminated because of her disability requires more discussion. There is no evidence that there was another similarly situated employee; that is, a non-disabled probationary employee who failed to secure money and yelled at co-workers. Therefore, there is no evidence that suggests Plaintiff was treated differently than a similarly situated, non-disabled employee.

Plaintiff's primary argument seems to be that her yelling was due to her diabetes, and her diabetes constituted a disability; therefore, in terminating Plaintiff because she yelled at co-workers, Defendants necessarily terminated her because of her disability. This reasoning will not support a discrimination claim. Plaintiff does not dispute (nor can she) that terminating an employee because she yelled at others is legitimate and nondiscriminatory. Therefore, Plaintiff must demonstrate that Defendants relied on this incident as a pretext for disability discrimination

– but the reason why Plaintiff yelled is not relevant to this inquiry and the fact that Plaintiff yelled because she was a diabetic experiencing low blood sugar would not help prove that she was fired *because* she was a diabetic. *E.g., Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.6 (2003) (rejecting notion that an employment action based on workplace misconduct that happens to be related to a disability constitutes discrimination); *Nahal v. Allina Health Sys.*, 842 Fed. App'x 9 (8th Cir. 2021) (no discrimination where employee was fired for excessive absenteeism, even though absences were the result of employee's PTSD).

Plaintiff has not presented evidence demonstrating that Defendants' stated explanation for her termination – her failure to secure money and her yelling at co-workers – was a pretext for discrimination. Therefore, Defendants are entitled to summary judgment on this claim.

### C. Count III – Hostile Work Environment Based on Race, Color, or National Origin

The parties agree that Plaintiff's hostile work environment claims require proof that "(1) she is a member of the class of people protected by the statute, (2) she was subject to unwelcome harassment, (3) the harassment resulted from her membership in the protected class, and (4) the harassment was severe enough to affect the terms, conditions, or privileges of her employment." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019) (quotation omitted). Defendants argue that the evidence in the Record, if submitted to a jury, would not support the third or fourth elements, and the Court agrees.

The Court will start with the fourth element. Plaintiff has not identified harassing conduct that was severe enough to affect the terms or conditions of her employment. The conduct is analyzed both subjectively (from the Plaintiff's perspective) and objectively. *E.g., Blomker v. Jewell*, 831 F.3d 1051, 156 (8th Cir. 2016). The standard for objective severity is demanding; the conduct "must be extreme and not merely rude or unpleasant to affect the terms and conditions of

employment." *Id.* (quotation omitted). Conduct that is rude, inappropriate, and subjectively offensive is not necessarily sufficiently severe to satisfy the objective component of the test. *E.g., Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 779 (8th Cir. 2012). "Hostile work environment harassment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 823 (8th Cir. 2017) (cleaned up).

The facts in this case fall far short of demonstrating that Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insults." Most of the incidents she describes as contributing to her hostile work environment were workplace decisions that she did not like (such as changing her hours or work duties). The most offensive conduct – George yelling at her, telling her that she was slow, and otherwise acting rudely – is insufficiently severe to support a hostile work environment claim. The civil rights statutes are not a "general civility code for the American workplace," *Jackman v. Fifth Judicial Dist. Dep't of Correctional Servs.*, 728 F.3d 800, 806 (8th Cir. 2013) (citation omitted), and while the Record might permit a jury to conclude that Plaintiff was treated rudely on certain occasions, the Record does not contain evidence of conduct that would support a hostile work environment claim.

Even if Plaintiff could satisfy the fourth element, she cannot satisfy the third because there is no evidence that would permit a jury to find that the harassment she alleges was due to her race, color or national origin. Plaintiff has attempted to present evidence supporting the fact that "George favored Caucasian employees over people of color," (Doc. 30, p. 25 (Plaintiff's proposed uncontroverted fact No. 5)), but the evidence she cites does not establish her proposed fact. She refers to a statement from Bryan Harris, (Doc. 30-28), but the statement is not a sworn statement

18

so it cannot be considered. Regardless, it states that Hagan and George had favorites in the department and that "*most* of [the] group of special employees/friends are Caucasians/white," (emphasis supplied), which does not show animus based on race. Carolyn Broadway submitted a sworn statement stating that she has observed George "mistreating [Plaintiff] and other people of color, including me. I believe that his behavior is racially motivated." (Doc. 30-25, ¶ 6.) This statement is too general to support an inference that George acted based on anyone's race, and Broadway's belief that his actions were racially motivated is not competent evidence. Plaintiff also refers to an affidavit from Imelda Neur, but it is not signed so it cannot be considered. (Doc. 30-27.)[16] In short, Plaintiff has not identified competent evidence in the record that George or Hagan acted on racial animus.

The Record does not contain evidence that would permit a jury to conclude that Plaintiff suffered (1) severe and pervasive harassment that was (2) because of her race, color or national origin. Therefore, Defendants are entitled to summary judgment on Count III.

### D. Count IV – Hostile Work Environment Based on Gender

The Court's holding with respect to Count IV is the same as its holding with respect to Count III. The Record does not contain evidence that would permit a jury to conclude that Plaintiff suffered (1) severe and pervasive harassment that was (2) because of her gender. Therefore, Defendants are entitled to summary judgment on Count IV.

### E. Count V – Retaliation

Count V alleges that Plaintiff was subjected to retaliation after she initiated contact with an EEO counselor on September 10, 2017. (Doc. 1, ¶ 61.) *McDonnel Douglas*'s burden shifting

---

[16] Plaintiff sought leave to submit a corrected affidavit from Neur, (Doc. 33), but instead of attaching the affidavit to the motion, Plaintiff attached another copy of the motion. (Doc. 33-1.) Regardless, on this issue the unsigned affidavit generally states that "Caucasians . . . were given breaks and allowed to take long lunches" and that Hagan and George "refused sick leave to people of color." But, no specifics are provided.

framework applies to this claim but the requirements for the prima facie showing are slightly different: "a plaintiff must show (1) she engaged in protected conduct, (2) she was subjected to an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action." *Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 811 (8th Cir. 2018). If Plaintiff establishes a prima face case of retaliation, the burden shifts to Defendants to identify a legitimate, non-retaliatory reason for the adverse action; after that, Plaintiff must identify evidence demonstrating that the proffered reason is a pretext for retaliation. Defendants contend they are entitled to summary judgment, and the Court agrees.

While the Complaint alleges many retaliatory acts, as discussed in the Court's Order on the Motion to Dismiss, (Doc. 20, pp. 3-4), only six were exhausted:

- The denial of breaks.

- Plaintiff was not paid as much as her predecessors.

- On September 1, 2017, Hagan changed Plaintiff's schedule from a schedule with flexible duty hours to a fixed schedule.

- On September 22, 2017, Hagan issued Plaintiff a written letter of counseling for leaving the vending machine money unsecured.

- Hagan threatened to charge Plaintiff with being AWOL but later rescinded it.

- On December 8, 2017, Plaintiff was terminated.

Plaintiff cannot establish a prima facie case of retaliation with respect to the first three items on this list. There cannot be a causal connection between those three incidents and Plaintiff's protected activity because they all began before Plaintiff engaged in protected activity on

September 10, 2017. The fact that Defendants' practices continued after Plaintiff initiated the EEO process does not establish a causal connection.[17]

The parties have not directed the Court to any evidence establishing when Hagan learned that Plaintiff started the EEO process. For the sake of argument, the Court will presume that Plaintiff can establish a prima facie case of retaliation with respect to the counseling letter related to vending machine money. Nonetheless, for the reasons stated previously, the Record establishes a legitimate, non-retaliatory reason for the counseling letter, and Plaintiff has not identified any evidence establishing this to be a pretext. Similarly, Plaintiff has not identified any evidence establishing that the reasons given for her termination were a pretext for retaliation. Even if the decision to terminate Plaintiff can be characterized as harsh, that characterization would not support a claim of retaliation. *E.g., Fercello v. County of Ramsey*, 612 F.3d 1069, 1080 (8th Cir. 2010).

With respect to the threatened discipline, the parties agree that Plaintiff alleged that a supervisor (apparently, Hagan) "threatened to charge [Plaintiff] as AWOL while she met with her EEOC counselor but did not charge her." (Doc. 26, p. 7; Doc. 30, p. 13.) Even if there is evidence in the Record that this threat occurred, the fact that it was not carried out means that there was no adverse employment action. "A materially adverse action must be more disruptive than a mere inconvenience or an alteration of job responsibilities. There must be a material change in employment status—a reduction in title, salary, or benefits." *Wenzel v. Missouri-American Water Co.*, 404 F.3d 1038, 1042 (8th Cir. 2005) (quotation omitted). And, significantly, Plaintiff does not argue otherwise, nor does she present any argument explaining how this incident can support a retaliation claim.

---

[17] The Court need not repeat its analysis of Defendants' reasons for its break policy or paying Plaintiff the wage that they did.

For these reasons, Defendants are entitled to summary judgment on all claims under Count V.

## F.  Count VI – Failure to Accommodate

Plaintiff contends that Defendants failed to accommodate her disability.  As noted earlier in Part II.B, there is no evidence that Plaintiff suffered from a disability as defined under the Rehabilitation Act, and for that reason alone Defendants would be entitled to summary judgment. But, even if she did suffer from a disability, Defendants would be entitled to summary judgment because there is no evidence in the Record that Defendants failed to fulfill their obligation to accommodate Plaintiff's needs.

The Rehabilitation Act requires an employer to collaborate with employees to address accommodation requests.  However, the employee "bears the initial burden of demonstrating that [s]he requested reasonable accommodations, and that those accommodations would render h[er] otherwise qualified for" her job.  *Mershon v. St. Louis Univ.,* 442 F.3d 1069, 1077 (8th Cir. 2006); *see also EEOC v. Convergys Customer Mgt. Group, Inc.,* 491 F.3d 790, 795 (8th Cir. 2007) ("*Convergys*").  Therefore, Plaintiff had to "provide relevant details of [her] disability and, if not obvious, the reason that [her] disability requires an accommodation."  *Convergys,* 491 F.3d at 795; *see also Rask v. Fresenius Med. Care N. Am.,* 509 F.3d 466, 470 (8th Cir. 2007).  The employer may also request additional documentation or clarification to support the request.  *E.g., Kobus v. College of St. Scholastica, Inc.,* 608 F.3d 1034, 1039 (8th Cir. 2010); *Miller v. National Cas. Co.,* 61 F.3d 627, 630 (8th Cir. 1995).

Here, Defendants tried to twice to determine whether Plaintiff needed accommodations. The first time she denied having a medical condition that required accommodation, and she did not respond to the second request by providing medical documentation establishing that she needed

Case 4:20-cv-00601-BP   Document 35   Filed 10/19/21   Page 22 of 23

to take breaks at a certain time each day. In fact, the Record in this case does not establish that Plaintiff needed to take breaks at a certain time each day. Plaintiff argues that "supervisors . . . knew that Plaintiff was requesting regularly scheduled breaks," (Doc. 30, p. 52), but (1) there is no evidence in the Record establishing this[18] and (2) there is no evidence in the Record establishing that Plaintiff needed regular breaks as an accommodation for a disability. Therefore, even if Plaintiff's diabetes is a disability within the meaning of the Rehabilitation Act, Defendants are entitled to summary judgment because there is no evidence that Plaintiff presented the documentation necessary to create a duty to accommodate her.

## III. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, (Doc. 26), is **GRANTED** as to all claims.

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
DATE: October 19, 2021                         UNITED STATES DISTRICT COURT

---

[18] There is evidence that Plaintiff asked for breaks; there is no evidence that she asked for a fixed schedule for her breaks, much less that a fixed schedule was recommended by a doctor.